**Rodney E. GRAVATT, Plaintiff— Appellant,**

v.

**The PAUL REVERE LIFE INSUR-ANCE COMPANY, a corporation, Defendant—Appellee.**

No. 02–17028.

United States Court of Appeals, Ninth Circuit.

Submitted April 15, 2004.*

Decided June 7, 2004.

Calvin C. Thur, Roger O'Sullivan, Thur & O'Sullivan, Scottsdale, AZ, for Plaintiff–Appellant.

Stephen M. Bressler, Esq., Kimberly A. Demarchi, Esq., Lewis & Roca, LLP, Phoenix, AZ, for Defendant–Appellee.

Before: WALLACE, KOZINSKI and THOMAS, Circuit Judges.

MEMORANDUM **

The district court held that Gravatt failed to show excusable neglect, citing

---

* This panel unanimously finds this case suitable for decision without oral argument. *See* Fed. R.App. P. 34(a)(2).

** This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by Ninth Circuit Rule 36–3.

*Engleson v. Burlington Northern Railroad Company,* 972 F.2d 1038 (9th Cir. 1992), for the proposition that "ignorance or carelessness on the part of a litigant or his attorney ... [are not] grounds for relief under Rule 60(b)(1)." *Id.* at 1043. The district court abused its discretion in failing to apply the equitable test for excusable neglect.

"[T]he determination of whether neglect is excusable is an equitable one that depends on at least four factors: (1) the danger of prejudice to the opposing party; (2) the ... [gravity of the neglect] and its potential impact on the proceedings; (3) the reason for the [neglect]; and (4) whether the movant acted in good faith." *Bateman v. United States Postal Serv.,* 231 F.3d 1220, 1223–24 (9th Cir.2000) (citing *Pioneer Investment Servs. Co. v. Brunswick Assocs. Ltd. Partnership,* 507 U.S. 380, 395, 113 S.Ct. 1489, 123 L.Ed.2d 74 (1993)).

In *Briones v. Riviera Hotel & Casino,* 116 F.3d 379 (9th Cir.1997) (per curiam), we held that *"Pioneer* sets forth an equitable 'framework' for determining the question of excusable neglect in particular cases, and we will ordinarily examine all of the circumstances involved rather than holding that any single circumstance in isolation compels a particular result regardless of the other factors." *Id.* at 382 n. 2. The district court's failure to weigh the *Pioneer* factors was an abuse of discretion. *See Bateman,* 231 F.3d at 1224 ("The court would have been within its discretion if it spelled out the equitable test and then concluded that ... [the party moving for reconsideration] had failed to present any evidence relevant to the four factors. But it abused its discretion by omitting the correct legal standard altogether.").

The *Pioneer* factors clearly weigh in favor of granting the motion. Gravatt's lawyer's neglect consisted of failure to meet filing obligations, failure to obey court orders, failure to respond to motions or pleadings and failure to file a statement of controverting facts in opposition to Paul Revere's summary judgment motion. There is no evidence that Paul Revere was prejudiced by Gravatt's lawyer's neglect. The sole prejudice cited by the district court is the loss to Paul Revere of the opportunity to take the deposition of Gravatt's attorney before her death. The finding was not made on the basis of evidence in the record, but rather a presumption of consequences based on defense counsel's arguments. Neither the district court nor Paul Revere has explained, given application of the attorney-client and work product privileges, how the deposition could have been accomplished in the instant action or why the deprivation of the information sought would have created a tangible harm to Paul Revere. Moreover, it seems highly unlikely that a lawyer who is dying of cancer and has missed deadlines because of her illness would be able to disclose any information that would be helpful to Paul Revere. It is almost implausible that, given her circumstances, Gravatt's lawyer was making strategic decisions not to file important documents on behalf of her client or heed court orders. Though the dissent claims that we, not Gravatt, attribute Vining's neglect to her illness, Dissent at 3, Gravatt's brief clearly demonstrates that Vining's illness is the crux of his case for excusable neglect. *See, e.g.,* Appellant's Opening Br. at 8 ("The offer of proof [filed on September 20, 2001, by Gravatt's attorney Cure] included a response to Paul Revere's Statement of Facts, outlining some of the things that Vining should have (and perhaps would have) raised in responding to the summary judgment motions of Paul Revere if she had not been suffering from depression and mental impairments arising

from her undiagnosed metastatic cancer of the liver."); *see also id.* at 8–9 (summarizing affidavits of attorneys who knew Vining, attesting to the fact that " 'something drastic happened to [Vining] at least the year before she died that caused her behavior to change so radically' ").

Reconsideration is of course a burden on the court, but the reason for the lawyer's neglect was a serious, debilitating illness, which ultimately resulted in her death. Paul Revere's assertion that the lawyer's failings—which began when she became ill—were not due to her health condition but rather were part of a pattern of intentional conduct is simply not believable. Affidavits from the lawyer's daughter and a doctor who reviewed her medical records support the conclusion that the lawyer's neglect was due to fatal stomach and liver cancer, and Gravatt introduced evidence that she had always been a conscientious attorney before she fell ill. Similarly, there is no evidence of bad faith on the record. Gravatt's lawyer told him she had made mistakes with his case but assured him she would try to fix them, and if that didn't work, he should sue her for malpractice. Gravatt understandably followed his lawyer's advice.

The district court overstated the significance of the fact that Gravatt's case was decided on the merits, not by default judgment. The court granted Paul Revere's summary judgment motion based only on its statement of facts. Gravatt was deprived of the benefit of having a lawyer introduce evidence to create a triable issue of material fact and defeat Paul Revere's summary judgment motion. The dissent makes much of the fact that the district court's summary judgment order "fills eighteen pages" and reflects a "methodical[ ] sifting through the entire record and analy[sis of] the evidence under controlling law." Dissent at 197. The district court

was commendably careful in its consideration of Paul Revere's summary judgment motion, but there is a big difference between considering the motion sua sponte and doing so with the benefit of adversarial briefing. Counsel often will raise issues that may not be evident to the court, and even introduce additional evidence that might not yet be in the record, to survive an opponent's summary judgment motion. In light of the fact that "the district court rejected some of Paul Revere's contentions and acknowledged the weaker aspects of its decision," *id.,* one can only imagine how many more weaknesses would have been called to the court's attention, had the court had the benefit of briefing by counsel for Gravatt.

The district court also denied Gravatt's motion on grounds that it was not filed within a reasonable time, because he could have filed the motion earlier and Paul Revere was prejudiced by his unjustified delay in filing. Under rule 60(b)(1), motions for relief from judgment based on excusable neglect must be made "within a reasonable time," and "not more than one year after the judgment." Fed.R.Civ.P. 60(b). Whether Gravatt's six-month delay "constitutes 'reasonable time' depends upon the facts of [his] case, taking into consideration the interest in finality, the reason for delay, the practical ability of the litigant to learn earlier of the grounds relied upon, and prejudice to other parties." *Ashford v. Steuart,* 657 F.2d 1053, 1055 (9th Cir. 1981) (per curiam); *see also* 11 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2866, at 382–92 (2d ed., 1995).

Applying the *Ashford* factors to this case, the interest in finality clearly weighs against granting Gravatt's motion. However, as previously noted, the reason for the delay appears to have been his lawyer's serious illness. Moreover, Gravatt

filed a malpractice claim against his lawyer because she told him to do so. He was justified in heeding his lawyer's advice. It's true Gravatt might have been able to learn about his lawyer's illness earlier, but, in any event, there is no showing of the most important factor, prejudice. As discussed above, the record is insufficient to sustain the district court's finding that the prejudice to Paul Revere was so significant that it warranted denying Gravatt's motion.

For these reasons, we hold that the district court abused its discretion and vacate the order denying the motion for relief from judgment and remand with instructions to the district court to grant Gravatt's rule 60(b)(1) motion.

**REVERSED AND REMANDED.**

WALLACE, Senior Circuit Judge, dissenting.

The district court correctly determined that Gravatt "did not promptly seek relief" from the summary judgment it entered against Gravatt on May 15, 2000. Gravatt's "Motion for Relief from Judgement" (Motion) indeed was not "within a reasonable time" as required by Federal Rule of Civil Procedure 60(b) when it was filed (1) one year after the district court entered judgment on the merits, (2) at least half a year after hearing that his action was dismissed, (3) months after initiating a malpractice suit that rests on the same allegation, (4) only after learning that the malpractice suit would yield no meaningful recovery, and (5) just after Paul Revere Life Insurance Company (Paul Revere) could no longer collect evidence to oppose such relief. I cannot join the majority in its attempt to take this perfectly sound decision and recast it as an abuse of discretion.

I start where we should: by identifying the applicable standard of review since, as often is the case, it is critical to our decision. We are to review the district court's denial for an abuse of discretion. *G.C. & K.B. Invs., Inc. v. Wilson,* 326 F.3d 1096, 1108 (9th Cir.2003). Under this *deferential* standard, we are not to disturb the district court's exercise of discretion "unless there is a definite and firm conviction that the court below committed a clear error of judgment in the conclusion it reached upon a weighing of the relevant factors." *Laurino v. Syringa Gen. Hosp.,* 279 F.3d 750, 753 (9th Cir.2002) (quotation marks and citation omitted).

A motion seeking Rule 60(b) relief "shall be made within a reasonable time." FED. R. CIV. P. 60(b). "What constitutes 'reasonable time' depends upon the facts of each case, taking into consideration the interest in finality, the reason for delay, the practical ability of the litigant to learn earlier of the grounds relied upon, and prejudice to other parties." *Ashford v. Steuart,* 657 F.2d 1053, 1055 (9th Cir.1981) (per curiam). The "facts of [this] case" cut overwhelmingly against allowing the Motion.

As the majority concedes, "the interest in finality clearly weighs against granting Gravatt's motion." The judgment from which Gravatt seeks relief is not the garden-variety default judgment that is quickly undone. Rather, Gravatt wishes to unravel a summary judgment *on the merits* that followed eighteen months of litigation, extended discovery, multiple court hearings, and numerous other proceedings. The summary judgment order fills eighteen pages, methodically sifting through the entire record and analyzing the evidence under controlling law. Notably, the district court rejected some of Paul Revere's contentions and acknowledged the weaker aspects of its decision. Only the most compelling circumstances should warrant upsetting such a deliberate and

assiduous resolution, let alone one that has remained dormant for a year and whose appeal has been dismissed. *See id.* ("Because the time for appeal had passed in this case, the interest in finality must be given great weight.").

Gravatt has failed to show the existence of such circumstances here, as he has not provided a valid reason for waiting a full year before moving for relief from the judgment. To fill the void, the majority—without any prompting from Gravatt—imports Gravatt's earlier excuse for failing to respond to Paul Revere's summary judgment motion: "the reason for the delay appears to have been his lawyer's serious illness." I, too, can surmise that his attorney, Pamela Vining, who was suffering from cancer, did not immediately apprise him of the summary judgment. But even if true (which we do not know), this accounts for a fraction of Gravatt's dilatoriness at best. Gravatt stated under oath that he learned of the summary judgment in June of 2000, and the record indicates that he consulted another attorney who verified the case's status on October 6, 2000. The majority thus cannot seriously contend that Gravatt blindly accepted Vining's invitation to sue her for malpractice. His new counsel could have and should have moved to set aside the judgment—unless he had a different litigation strategy in mind.

I do not dwell on the consequences of Vining's illness further—after all, the majority offered this explanation, not Gravatt. Gravatt focused on what he claims caused him to procrastinate an additional seven months after October 2000 to file his Motion: Vining's refused to return his file (the Vining file). This excuse crumbles under close scrutiny.

For starters, Gravatt does not explain how earlier access to the Vining file would have expedited the Motion's submission.

The Motion largely centers on Vining's failure to file a valid response to Paul Revere's summary judgment motion and the effect of such failure on his case. Not only was all of this documented in the district court's docket, but Gravatt and his new lawyer should have, and undoubtedly would have, used the court's records as a source of information on his lawsuit before resorting to Vining's file. If Gravatt and his new attorney distrusted the quality of Vining's representation, it would have been foolhardy to believe that her file would have been as complete or reliable as public records. The fault for not consulting the district court docket was theirs.

Despite lacking access to the Vining file, Gravatt nevertheless managed to commence a malpractice suit against Vining on January 31, 2001 (three and a half months prior to the Motion) founded on the *same* allegation as the Motion: that Vining submitted a deficient response to Paul Revere's summary judgment motion. Indeed, the only difference between the malpractice complaint and Gravatt's Motion is that the complaint deemed Vining's action a negligent failure to exercise the care of a prudent legal practitioner while the Motion recast them, given Vining's illness, as "excusable neglect" or "extraordinary circumstances." The Vining file's contents did not drive this recharacterization—they would not have revealed any new information on Vining's medical condition. Rather, legal malpractice morphed into excusable neglect only when the latter became legally expedient. Gravatt's "reason for failing to take action sooner," simply put, is unpersuasive. *See Pac. Far E. Lines, Inc. v. Wyle,* 889 F.2d 242, 249 (9th Cir.1989).

Gravatt's actual motive (unrecognized by the majority) for not seeking Rule 60(b) relief clearly surfaces in his Opening Brief (and is repeated in his Reply Brief).

Gravatt frankly acknowledges that he filed the Motion "[o]n May 15, 2001, *after concluding that Vining's estate did not have sufficient assets to satisfy a judgment if Gravatt prevailed in his legal malpractice action.*" (emphasis added) Gravatt had known for some time that Vining's professional liability insurance policy had been cancelled. Thus, when he learned that Vining's husband filed for Chapter 7 bankruptcy around the time of his wife's death in April 2001, Gravatt grew worried that he would be unable to collect on a malpractice judgment. He now admits that this provided the impetus to challenge the summary judgment's finality.

It is difficult to ignore the gamesmanship involved, and we should not. Gravatt's decision to pursue his malpractice claim at the exclusion of setting aside the summary judgment was tactical. After all, Gravatt had every incentive not to disturb the summary judgment against him—leaving it intact ensured that Vining's malpractice effected a tangible injury and therefore increased his chances of reaping a generous malpractice award. Only upon realizing that this strategy was doomed did Gravatt resort to what his Reply Brief euphemistically terms a less "effective route to relief": attempting to reopen the litigation against Paul Revere. This change of course required another change in counsel—Gravatt's third since first hiring Vining. It is doubtful that the interests of Paul Revere and the district court were factors in Gravatt's strategic calculus. The district court acted within its discretion in thwarting Gravatt's effort to pick and choose legal relief at the court's and Paul Revere's expense.

The majority mounts a weak assault on the district court's finding that Gravatt's delay prejudiced Paul Revere. This is not a case where Paul Revere merely "lost a quick victory." *Bateman v. U.S. Postal Serv.*, 231 F.3d 1220, 1225 (9th Cir.2000). As described above, Paul Revere litigated for eighteen months before obtaining summary judgment in its favor. Moreover, by waiting until it was no longer possible to depose Vining or take a statement from her, Gravatt deprived Paul Revere of its only opportunity to probe the extent to which Vining's decisions were tactical judgments. Here the majority engages in further speculative fact finding: considering it "almost implausible that, given her circumstances, Gravatt's lawyer was making strategic decisions not to file important documents on behalf of her client or heed court orders." This misses the point. Paul Revere was prejudiced precisely because it was denied the chance to shed light on the plausibility that Vining's obstructionist legal maneuvering was strategic. The majority's speculation that "it seems highly unlikely that a lawyer who is dying of cancer and has missed deadlines because of her illness would be able to disclose any information that would be helpful to Paul Revere" is subject to the same criticism: losing the opportunity to show what otherwise "seems highly unlikely" itself is prejudicial.

Finally, it is unfortunate that the majority faults Paul Revere for not "explain[ing], given application of the attorney-client and work product privileges, how the deposition could have been accomplished in the instant action." Paul Revere has never "explained" why the attorney-client and work-product privileges would not have posed obstacles because the issue was never raised in this litigation, and, since this appeal was submitted on the briefs, Paul Revere was not afforded the opportunity to respond to this new concern of the majority directly. The blame is therefore ours—not Paul Revere's. In our rush to limit our time on the bench, a party may have suffered a reversal when twenty minutes of oral argument could have satisfied

a majority that this outcome is unwarranted.

Furthermore, Paul Revere had no reason to discuss the attorney-client and work-product privileges before the majority put them at issue because they are inapplicable. The work-product privilege generally governs discovery of documents and other tangible materials produced for a pending case. *See generally Emergency Care Dynamics, Ltd. v. Superior Court,* 188 Ariz. 32, 932 P.2d 297 (Ariz.Ct.App. 1997) (discussing the nature of the work-product privilege). Paul Revere does not wish it had access to documents; it would like to have examined Vining under oath (or taken a statement from her).

As for the attorney-client privilege, by statute it only attaches to *communications* between the client and his or her counsel. *See* Ariz.Rev.Stat. Ann. § 12–2234(A) ("In a civil action an attorney shall not, without the consent of his client, be examined as to any communication made by the client to him, or his advice given thereon in the course of professional employment"). By itself, Vining's litigation strategy does not constitute an attorney-client communication. Even in the unlikely event that the substance of any communication touched on tactical matters, these instances would be few; Gravatt avers that Vining hardly discussed any development in his case, let alone strategy. To the extent that Paul Revere would want to inquire into communications between Gravatt and Vining, Gravatt almost certainly waived their privileged nature by "interject[ing] the issue of advice of counsel into the litigation" when "recognition of the [attorney-client] privilege would deny the opposing party access to proof without which it would be impossible for the factfinder to fairly determine the very issue raised by that party." *State Farm Mut. Auto. Ins. Co. v. Lee,* 199 Ariz. 52, 13 P.3d 1169, 1179 (2000) (en banc). In

other words, Gravatt could not have argued that Vining's deficient representation warranted Rule 60(b) relief only to take refuge behind the attorney-client privilege in order to prevent Paul Revere from discovering the facts of such representation. *See id.* at 1175–77 (synthesizing Arizona precedent disallowing litigants from wielding a privilege as both a sword and a shield).

In sum, it is clear to me that the district court's determination that Gravatt's Motion was untimely certainly did not constitute an abuse of discretion. Simply put, Gravatt has failed to invoke in my mind "a definite and firm conviction that the court below committed a clear error of judgment in the conclusion it reached upon a weighing of the relevant factors." *Laurino,* 279 F.3d at 753. Therefore, I must dissent.